

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
06/08/2017

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Daniel Turcotte &** | § | **Case No. 16-36040** |
| **Daisy Turcotte,** | § | |
| | § | **Chapter 13** |
| **Debtors.** | § | |

## MEMORANDUM OPINION DENYING CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION DATED APRIL 19, 2017 WITHOUT PREJUDICE TO FILING AN AMENDED PLAN
[Doc. Nos. 33 & 58]

### I.    INTRODUCTION

This case presents the narrow of issue of what interest rate is appropriate in a Chapter 13 plan for a secured creditor who will be paid on a cramdown basis.  There is no question that the Supreme Court's holding in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), governs this dispute.  However, there is disagreement in this District about the application of *Till*, and that is why the undersigned judge issues this Memorandum Opinion.

One bankruptcy judge, the Honorable Marvin Isgur, has held that *Till* requires the cramdown interest rate to be "1–3% above the prime rate."  *In re Montemayor*, No. 10-36990, 2010 WL 5315814, at *1 (Bankr. S.D. Tex. Dec. 20, 2010).  Another bankruptcy judge, the Honorable David Jones, interprets *Till* as requiring a bankruptcy court to start not with the prime rate, but with a completely "risk free" rate—such as the five-year treasury rate—and then add basis points to adjust for the risk component.  *In re Vasquez*, No. 12-30834, 2012 WL 3762981, at *2 (Bankr. S.D. Tex. Aug. 29, 2012).  While the undersigned judge agrees with Chief Judge Jones that the treasury rate is much more representative of a risk-free rate than is the prime rate, the undersigned judge nevertheless agrees with Judge Isgur's interpretation of *Till* that

1

bankruptcy courts are required to use the prime rate as the starting point for determining what the cramdown interest rate should be in a Chapter 13 case.

In the case at bar, the plan proposes to pay the contract rate of 1.99% on the claims held by the debtors' car lender. This creditor has objected to confirmation of the plan on the grounds that it violates *Till*. The creditor points out that the prime rate on the date of the filing of this case was 3.25%, and argues that the cramdown rate should be prime plus a risk adjustment of 2.0%—or 5.25%. The debtors argue that the contract rate of 1.99% is the appropriate rate because this rate is greater than the five-year treasury rate and thus accounts for any risk that they pose—which they contend is very low given the particular circumstances in this case. Because the undersigned judge shares Judge Isgur's view that *Till* requires use of the prime rate to determine the cramdown rate, this Court believes it has no choice but to deny confirmation of the pending plan. By failing to use an appropriate cramdown interest rate, the proposed plan cannot be confirmed because it violates 11 U.S.C. § 1325(a)(5)(B)(ii).[1]

The Court now makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rules 7052 and 9014. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such; and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. Further, this Court reserves the right to make additional findings and conclusions as it deems necessary.

## II.   FINDINGS OF FACT

1. On December 2, 2016, Daniel and Daisy Turcotte (collectively, the "Debtors") filed a Chapter 13 petition (the "Petition Date"). [Doc. No. 1]. Daniel Turcotte ("Mr. Turcotte") is retired from Walmart and is currently unemployed; Mr. Turcotte does not

---

[1] Hereinafter, any reference to any section (i.e., §), unless otherwise noted, refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, and any reference to "the Code" refers to the United States Bankruptcy Code.

2

anticipate being employed in the immediate future. [Tape Recording, Apr. 20, 2017 Hearing, at 4:59:39–4:59:45 P.M.]; [Doc. No. 20, p. 41 of 48 (answer to Question No. 13)]. Meanwhile, Daisy Turcotte ("Ms. Turcotte") is a teacher with Cypress-Fairbanks Independent School District ("Cy-Fair ISD"). [Doc. No. 20, p. 40 of 48]. She has been a teacher with Cy-Fair ISD for two years, but has been teaching since 2011. [Tape Recording, Apr. 20, 2017 Hearing, at 4:57:20–4:57:23 P.M.]. Ms. Turcotte earns $5,828.34 per month, which equates to approximately $69,940.00 per annum. [Doc. No. 20, p. 40 of 48]. Under the terms of her employment with Cy-Fair ISD, if Ms. Turcotte loses her present position, the Cy-Fair ISD must find another position for her at another school within the district. [Tape Recording, Apr. 20, 2017 Hearing, at 4:57:20–4:57:37 P.M.].

2. On December 2, 2016, the Debtors submitted their certificates of credit counseling, [Doc. Nos. 2 & 3], and filed a proposed wage order, [Doc. No. 4]. Approved on December 5, 2016, the wage order provided for the withdrawal of $2,075.00 per month from Ms. Turcotte's wages to be paid to the Chapter 13 trustee. [Doc. No. 10].

3. On December 21, 2016, the Debtors filed their schedules and asserted ownership in, among other assets, certain vehicles: (1) a 2015 Toyota Sienna valued at $28,000.00; and (2) a 2014 Toyota Tacoma valued at $20,800.00. [Doc. No. 20, p. 2 of 48]. Additionally, the Debtors also scheduled a 2015 Mitsubishi Outlander, [id.]; however, the Debtors have since surrendered this vehicle in order to reduce their monthly expenses (i.e., to avoid having to make monthly payments of $417.16 on this particular vehicle). [Doc. No. 58, p. 2 of 11]; [Claim No. 4, p. 5 of 7]; [Tape Recording, Apr. 20, 2017 Hearing, at 4:58:56–4:59:00 P.M.].

3

4. The Debtors scheduled Brazos Valley School Credit Union (the "Credit Union") as a secured creditor as follows: (1) an undisputed claim in the amount of $22,435.00, with a lien on the 2015 Toyota Sienna, [Doc. No. 20, p. 18 of 48]; and (2) an undisputed claim in the amount of $15,125.00, with a lien on the 2014 Toyota Tacoma, [*id.* at p. 19 of 48] (collectively the "Claims"). The parties have stipulated that there is equity in the Sienna of $7,300.00 and equity in the Tacoma of $6,800.00. [Tape Recording, Apr. 20, 2017 Hearing, at 4:54:14–4:54:33 P.M.]. Thus, the aggregate equity is $14,100.00.

5. On December 21, 2016, the Debtors filed their first Uniform Plan and Motion for Valuation of Collateral. [Doc. No. 22]. The Debtors proposed to pay the Claims in full over 58 months, with each of the claims bearing interest at a rate of 1.99% per annum. [*Id.* at p. 6 of 11]. This rate is the contract rate set forth in the promissory notes that the Debtors executed when they purchased the 2015 Toyota Sienna and the 2014 Toyota Tacoma. [Claim Nos. 6 & 7].

6. On January 17, 2017, the Credit Union filed its Objection to Motion for Valuation and to Confirmation of Chapter 13 Plan (the "Objection"). [Doc. No. 33]. The Objection asserts that the proposed interest rate of 1.99% is too low according to *Till*. [*Id.* at p. 2 of 3]. The Objection also asserts that the appropriate interest rate is 5.25%, which represents the sum of the prime rate as of the Petition Date (i.e., 3.25%), plus a risk factor of 2.00%. [*Id.*].

7. On April 19, 2017, the Debtors filed their amended Uniform Plan and Motion for Value of Collateral (the "Plan"), [Doc. No. 58], and an amended wage order, [Doc. No. 60]. According to the Plan and amended wage order, the Debtors propose to pay $1,990.00 per month to the Chapter 13 trustee for 60 months until December 2021, for a total of

$111,440.00. [Doc. No. 58, p. 1 of 11]. Thus, this amended wage order reduced the monthly withdrawal from the initial wage order by $85.00. [*See* Finding of Fact No. 2]. The Debtors again propose to pay the Claims in full at a 1.99% interest rate. [Doc. No. 58, p. 6 of 11]. The payments will be made through month 59 of the Plan. [*Id.* at p. 7 of 11].

8. On April 20, 2017, this Court approved the amended wage order that provides for the withdrawal of $1,990.00 per month from Ms. Turcotte's wages to be paid to the Chapter 13 trustee. [Doc. No. 61].

9. On April 20, 2017, the Court held a hearing on the Plan and the Objection. Only one witness, Ms. Turcotte, gave testimony; the Court finds that her testimony is credible and the Court gives her testimony substantial weight. In addition to testifying about her employment status, she testified that she believes the interest rate of 1.99% to be appropriate because: (1) on the Petition Date, the Debtors were current on their payments to the Credit Union, [Tape Recording, Apr. 20, 2017 Hearing, at 4:57:38–4:57:46 P.M.]; (2) the amended wage order significantly reduces the risk to the Credit Union because her employer automatically deducts the Plan payments and remits the funds directly to the Chapter 13 trustee; (3) her husband and she are current on their plan payments to the Chapter 13 trustee, [*Id.* at 4:57:40–4:57:45 P.M.]; and (4) the Debtors have already surrendered one vehicle—the 2015 Mitsubishi—so their monthly payments are lower, thus putting them at a lower risk now than when they originally obtained financing from the Credit Union for the Tacoma and the Sienna. [*Id.* at 4:57:16–4:59:00 P.M.].

### III.   CONCLUSIONS OF LAW

**A.  Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order**

  1.  Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  Section

1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all

civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11."

District courts may, in turn, refer these proceedings to the bankruptcy judges for that district.  28

U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General

Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy

courts.

The matter at bar is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it

affects the administration of the Debtors' Chapter 13 estate.  Additionally, this matter is a core

proceeding under 28 U.S.C. § 157(b)(2)(L) because the Court is required to determine what rate

the Claims must bear in order to decide whether to confirm the Plan.  Further, it is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(O) because a determination of what interest rate is

appropriate on the Claims necessarily affects the debtor-creditor relationship between the Credit

Union and the Debtors.  Finally, the issue at bar is a core proceeding under the general "catch-

all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir.

1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11

or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.");

*De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19

(Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under

28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does

not specifically name this particular circumstance"). Here, a dispute over what the proper cramdown interest rate should be for a secured claim in a Chapter 13 plan can only arise in a bankruptcy.

    2. <u>Venue</u>

Venue is proper under 28 U.S.C. § 1408(1) because the Debtors resided in the Southern District of Texas for 180 days prior to the Petition Date.

    3. <u>Constitutional Authority to Enter a Final Order</u>

Having concluded that this Court has jurisdiction over this matter, this Court nevertheless notes that *Stern v. Marshall,* 564 U.S. 462 (2011), sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders. However, an order denying confirmation of a proposed Chapter 13 plan is not a final order. *Bullard v. Blue Hills Bank*, 135 S.Ct. 1686, 1690 (2015) ("The question presented is whether such an order denying confirmation is a 'final' order that the debtor can immediately appeal. We hold that it is not."). Therefore, this Court concludes that there is no *Stern* concern regarding its entering an order denying confirmation of the Plan.

**B. Applicable Law**

    1. *Till* Requires this Court to Determine the Appropriate Rate on the Claims by Using the "Prime Plus" Approach

In order to obtain confirmation of a Chapter 13 plan, "the plan must accommodate each allowed, secured creditor in one of three ways: (1) by obtaining the creditor's acceptance of the plan; (2) by surrendering the property securing the claim; or (3) by providing the creditor both a lien securing the claim and a promise of future property distributions (such as deferred cash payments) whose total 'value, as of the effective date of the plan, . . . is not less than the allowed amount of the claim." *Till*, 541 U.S. at 468 (citing and quoting § 1325(a)(5)(B)(ii)). The third

avenue—which the Debtor has chosen in the case at bar—is "commonly known as the 'cram down option' because it may be enforced over a claim holder's objection." *Id.* at 469. Typically, under a cramdown, the plan pays the creditor's claim through installment payments, which requires that "over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." *Id.* (stating that because the claim is paid over time, it must bear interest). In the case at bar, the Plan proposes to pay the Claims on a cramdown basis over 59 months at an interest rate of 1.99% per annum. [Finding of Fact No. 7]. The question therefore is whether the proposed interest rate of 1.99% is a sufficient cramdown rate under *Till*.

In its plurality opinion, the Supreme Court determined that there are two steps required for determining the appropriate cramdown rate. First, the court must identify "the national prime rate, . . . which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight default risk." *Till*, 541 U.S. at 479. Second, the court must adjust the prime rate upwards because "bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id.* This adjustment depends on various factors, such as "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The Supreme Court suggests that an adjustment of 1.0% to 3.0% is appropriate. *Id.* at 480; *see also In re Montemayor*, 2010 WL 5315814, at *1; *In re LMR, LLC*, 496 B.R. 410, 430 (Bankr. W.D. Tex. 2013). This two-step formula is referred to as the "prime plus" rate approach (the "Prime Plus Approach"). *Till*, 541 U.S. at 479–80; *In re STC, Inc.*, Case No. 14-41014, 2016 WL 3884799, at *15 (Bank. S.D. Ill. Apr. 7, 2016). The

Fifth Circuit has expressly adopted the Prime Plus Approach.[2] *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 350 (5th Cir. 2008).

The rate derived under the Prime Plus Approach "depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan . . . ." *Till*, 541 U.S. at 479. Therefore, it is unnecessary for the court to "consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor . . . ." *Id.* at 476. Instead, the court should focus on "adequately compensat[ing] all [cramdown] creditors for the time value of their money and the risk of default." *Id.* at 477. "For these reasons, the prime plus rate . . . best comports with the purposes of the Bankruptcy Code." *Id.* at 479–80.

Despite the Fifth Circuit's adoption of the Prime Plus Approach promulgated by *Till*, there is at least one judge within the Southern District of Texas—as noted in the introduction— who has declined to apply the Prime Plus Approach in a Chapter 13 case. *See In re Vasquez*, 2012 WL 3762981, at *2. In *Vasquez*, the issue was what interest rate was appropriate for a creditor with a secured interest in real property (as opposed to vehicles, such as here). *Id.* at *1.[3] Chief Judge Jones determined that the appropriate starting point under *Till* was not the prime rate, but rather was the five-year treasury rate, which Chief Judge Jones then adjusted upwards for the risk involved in the particular case before him. *Id.* at *2. The undersigned judge construes the *Vasquez* opinion in this manner: Chief Judge Jones believes that *Till* requires bankruptcy courts to start **not** with the prime rate—which Chief Judge Jones believes already

---

[2] Because *Till* is a plurality decision, the Fifth Circuit evaluated each of the three opinions in *Till* to "determine which of these opinions, if any, controls." *Drive Fin.*, 521 F.3d at 348. After its evaluation, the Fifth Circuit stated the following: "For the foregoing reasons, we hold that the *Till* plurality's adoption of the prime-plus interest rate approach is binding precedent in cases presenting an essentially indistinguishable factual scenario." *Id.* at 350.

[3] The real property in *Vasquez* was not the debtors' homestead; therefore, § 1322(b)(2), which prevents modification of the rights of the holder of the lien on the debtors' principal residence did not apply.

includes a risk component[4]—but rather a risk-free rate, which, in *Vasquez*, was the five-year treasury rate.[5]

While the undersigned judge agrees with Chief Judge Jones that the prime rate already includes a risk component and that the five-year treasury rate is a much more appropriate rate to use if one wants to start with a rate that truly contains no risk component, the undersigned judge nevertheless construes *Till* to require bankruptcy courts to start with the prime rate—at least in Chapter 13 cases.[6]   Accordingly, the undersigned judge disagrees with the methodology that Chief Judge Jones used in *Vasquez*.   Indeed, in *Drive Financial Services*, the Fifth Circuit explicitly adopted the Prime Plus Approach set forth in *Till* when it stated that "we hold that the *Till* plurality's adoption of the prime-plus interest rate approach is binding precedent in cases presenting an essentially indistinguishable factual scenario . . . and overrules this circuit's prior precedent . . . ." 521 F.3d at 350.   In terms of assessing risk, a plausible argument can be made that the risk component for a loan secured by real estate (the collateral in *Vasquez*) should be different than the risk component for a loan secured by vehicles (the collateral in the case at bar). Nevertheless, the undersigned judge believes that regardless of whether the collateral is real

---

[4] Chief Judge Jones is absolutely correct: the prime rate does, in fact, include a risk component.  As one scholarly article has stated: "Whereas the rate on a treasury bond is risk-free, the prime rate includes a risk premium to reflect the inherent risk of default present in a loan to the most creditworthy borrower. The prime rate has typically exceeded the three-month treasury bill rate by 2% to 3.5%." April E. Kight, *Balancing the Till: Finding the Appropriate Cram Down Rate in Bankruptcy Reorganizations After Till v. Scs Credit Corporation*, 83 N.C. L. Rev. 1015, 1028 n.97 (2005).

[5] On August 29, 2012, when Chief Judge Jones issued the *Vasquez* opinion, the five-year treasury rate was 0.80% per annum, whereas the prime rate was 3.25%. Prime Rate History, FedPrimeRate.com, www.fedprimerate.com/wall_street_journal_prime_rate_history.htm (last updated May 26, 2017).

[6] There are other bankruptcy judges who agree with Chief Judge Jones that *Till* does not require a court to use the prime rate as the starting point. *See, e.g.*, *In re Village at Camp Bowie I, L.P.*, 454 B.R. 702, 713 (Bankr. N.D. Tex. 2011); *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574–79 (Bankr. D.D.C. 2011); *In re MPM Silicones, LLC*, 531 B.R. 321, 334 (S.D.N.Y. 2015).  However, these cited cases, and other cases found by this Court, are all Chapter 11 cases, whereas *Till* dealt with a Chapter 13 case.  As far as the undersigned judge can discern, Chief Judge Jones is the only bankruptcy judge who has issued an opinion holding that, in a Chapter 13 case, the starting point for determining the cramdown rate is the treasury rate, not the prime rate.

estate or personal property, the fact pattern is—to use the Fifth Circuit's words—"essentially indistinguishable" for purposes of applying *Till*. Therefore, the interest rate analysis must start with the prime rate rather than the five-year treasury rate.

As also noted in the introduction of this Opinion, one other sitting judge in the Southern District of Texas—the Honorable Marvin Isgur—has held that, at least in a Chapter 13 case, *Till* requires that the Court apply the Prime Plus Approach in determining what the proper cramdown rate should be.[7] In *Montemayor*, Bank of America—which held a lien on certain real estate owned by the debtors—objected to the plan that proposed to pay its claim at a rate that Bank of America argued was too low. 2010 WL 5315814, at *1. Judge Isgur disagreed by stating that: "The Court finds the 5.25% rate consistent with *Till*'s requirement that the required interest rate in a chapter 13 plan should be 1–3% above the prime rate." *Id.* (citation omitted).[8] The undersigned judge believes that Judge Isgur correctly applied *Till* in *Montemayor*, and therefore, in the case at bar, the undersigned judge will start with the national prime rate and then add at

---

[7] Bankruptcy Judge Letitia Z. Paul, who is now retired, also issued an opinion that although not expressly holding that *Till* requires use of the Prime Plus Approach, nevertheless used this approach in determining the cramdown rate in a Chapter 13 case. *In re Tirey*, 350 B.R. 62, 69 (Bankr. S.D. Tex. 2006).

[8] In *Montemayor*, the real estate securing the claim was the debtors' homestead. [Case No. 10-36990, Doc. No. 1, p. 14 of 49]. Because this property was the debtors' principal residence, § 1322(b)(2) prevents modifying the rights of the lien holder—including changing the interest rate. *See Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 331 (1993) (holding that § 1322(b)(2) prohibits modification of the interest rate on the loan on the debtor's principal residence). However, § 1322(b)(5) provides an exception to this rule. *See id.* at 330–31 (explaining the exception); *see also In re Cano*, 410 B.R. 506, 529–30 (Bankr. S.D. Tex. 2009) (holding that "[s]ection 1322(b)(5) provides an explicit exception to § 1322(b)(2)'s prohibition of mortgage modifications"). Specifically, this provision states that: "the plan may—. . . notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Moreover, § 1322(c)(2) sets forth that "in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title." *See also In re Carter*, No. 09-35587, 2009 WL 5215399, at *3–4 (Bankr. S.D. Tex. Dec. 28, 2009) (explaining the § 1322(c)(2) exception). The plan provision to pay the home loan in *Montemayor* fell within the exception allowed under §§ 1322(b)(5) and 1322(c)(2), and therefore Judge Isgur could approve modification of the interest rate set forth in the note securing the homestead—and indeed, he did so.

11

least one hundred basis points—but no more than three hundred basis points—to account for the risk factor associated with the Debtors.

 2. *Till* is Applicable Even if the Contract Rate is Lower than the Prime Rate

 The Prime Plus Approach will still apply when the contract rate is lower than the prime rate, such as in the case at bar. In *Till*, the original loan had an interest rate of 21.0% per annum. 541 U.S. at 470. The prime rate was significantly lower at approximately 8.0%. *Id.* at 471. Thus, after *Till*, courts began to question whether the Prime Plus Approach still applies when the contract rate of interest is lower than the prime rate; ultimately, however, they have concluded that the contract rate is irrelevant. *See, e.g.*, *In re Taranto*, 365 B.R. 85, 90 (B.A.P. 6th Cir. 2007); *In re Tirey*, 350 B.R. at 69; *In re Soards*, 344 B.R. 829, 832 (Bankr. W.D. Ky. 2006). Indeed, "[s]imply stated, where the plan proposes to pay the secured claim in installments over time, the *Till* rate of interest must be added to the payment to arrive at the present value of the claim and the contract rate of interest is irrelevant to the analysis." *In re Soards*, 344 B.R. at 832.

## C. Application of Law to the Facts in the Case at Bar

 There is no question that *Till* applies here, as this case involves a Chapter 13 plan proposing a cramdown interest rate.[9] Therefore, the Court must undertake the two-step analysis pursuant to the Prime Plus Approach articulated in *Till*. First, the Court must determine the appropriate prime rate. Second, the Court must adjust this prime rate based upon the level of risk attributable to the Debtors. The Court conducts its analysis as set forth below.

---

[9] The undersigned judge wants to emphasize that this holding in no way is to be construed to also apply to Chapter 11 cases. If and when a dispute in a Chapter 11 case ever arises as to what the interest rate should be, the undersigned judge will issue a ruling at that time.

1.  The Appropriate Prime Rate

Here, the Debtors have a contract rate with the Credit Union of 1.99%, and the Plan assigns this same rate to the Claims.  [Findings of Fact Nos. 7 & 9].  Stated differently, the Plan proposes a cramdown rate of 1.99%.  This proposed cramdown rate, however, does not comply with *Till*, which explicitly requires that the cramdown rate in a Chapter 13 case be determined by applying the Prime Plus Approach.  *Till*, 541 U.S. at 478–80.  For this Court to confirm the Plan, the cramdown interest rate must be calculated by starting with the national prime rate and then adjusting for risk.  On the Petition Date, the national prime rate was 3.50%, and as of the date of the entry on the docket of this Opinion, the national prime rate is 4.0%.  *See Prime Rate Update*, COMMERCE BANK, Apr. 26, 2017, https://www.commercebank.com/about/get-to-know-us/prime-rate.asp; F.R.E.D., *Bank Prime Loan Rate Changes:  Historical Dates of Changes and Rates*, ECONOMIC RESEARCH, Jan. 5, 2017, https://fred.stlouisfed.org/series/PRIME (citing the Wall Street Journal).[10]  Because the prime rate as of the Petition Date and the current prime rate are different, the Court must determine which of these two dates to use—or whether to use some other date.  Whichever rate the Court chooses, it is clearly a higher rate than the 1.99% proposed by the Plan.

There are various methods of choosing which date the Court should consider in applying the Prime Plus Approach.  For example, within the Fifth Circuit alone, one bankruptcy court has used the prime rate that was published within a few days before publication of the court's

---

[10] Choosing the so-called "national prime rate" is less perfunctory than one might believe.  For example, is the "national prime rate" determined by the prime rate set by a money center bank, such as Chase Bank?  Or, is it determined by reference to the prime rate located in the Wall Street Journal?  *See generally* Mark F. Bernstein, *The Federal Open Market Committee and the Sharing of Governmental Power with Private Citizens*, 75 VA. L. REV. 111 (1989).  In the case at bar, the Court finds that the appropriate source for the national prime rate is from the Wall Street Journal.  This is so because since the second quarter of 1994, the Wall Street Journal has been surveying numerous large banks and then publishing the consensus prime rate.  *See Wall Street Journal Prime Rate*, BANKRATE, http://www.bankrate.com/rates/interest-rates/wall-street-prime-rate.aspx (last accessed June 6, 2017).

opinion. *Tirey*, 350 B.R. at 69. Another has used the prime rate published as of the actual date

of the publication of the opinion. *In re Process Property Corp.*, 327 B.R. 603, 611 (Bankr. N.D.

Tex. 2005).

However, this Court chooses to use the rate as of the effective date of the Plan. The

Court opts for this approach because § 1325(a)(5)(B)(ii) reads as follows: ". . .[T]he court shall

confirm a plan if . . . with respect to each allowed secured claim provided for by the plan—the

plan provides that . . . the value, *as of the effective date of the plan*, of property to be distributed

under the plan on account of such claim is not less than the allowed amount of such claim . . . ."

(emphasis added). Further, the Fifth Circuit has recognized that: "The general consensus that

has emerged provides that a one to three percent adjustment to the prime rate *as of the effective

date* [of the plan] is appropriate." *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324,

333 n.53 (5th Cir. 2013) (citing and quoting *In re Riverbend Leasing LLC*, 458 B.R. 520, 535

(Bankr. S.D. Iowa 2011)) (setting the prime rate as of the effective date [of the plan] for purposes

of Chapter 11 plan confirmation).[11] Applying the Prime Plus Approach as of the effective date

has also been adopted by various bankruptcy courts throughout the country. *See In re Riley*, 428

B.R. 757, 766 (Bankr. N.D. Ohio 2010); *In re Knight*, 254 B.R. 227, 229 (Bankr. C.D. Ill. 2000).

Therefore, to determine the appropriate cramdown rate in the case at bar, this Court will use the

prime rate as of the effective date of the Plan.

According to the Supreme Court, the effective date of the plan "is the date on which the

plan is confirmed and becomes binding." *Hamilton v. Lanning*, 560 U.S. 505, 518 (2010); *see*

---

[11] While *Texas Grand Prairie* involved a Chapter 11 plan, the Court sees no reason why the Fifth Circuit's reasoning would not also apply to a Chapter 13 plan because relevant language from § 1325(a)(5)(B)(ii) in regards to Chapter 13 is identical to the Chapter 11 equivalent, § 1129(b)(2)(A)(i)(II). *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[The] normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.") (internal quotation and citation omitted).

*e.g., In re Montemayor*, 2010 WL 5315814, at *1 (using the date that the order confirming the plan was docketed as the effective date). At this point, the Court has not confirmed the Plan. Rather, the Court began the confirmation hearing on April 20, 2017, and then, after listening to the testimony of Ms. Turcotte and hearing oral arguments of counsel, continued the hearing until July 27, 2017. Assuming that the Court confirms the Plan and enters the order on that same day, July 27, 2017 will be the effective date of the Plan. No one knows what the prime rate will be on that date. Accordingly, for purposes of this Opinion, this Court will use the prime rate that was in effect on April 20, 2017. Then, on July 27, 2017, if the prime rate has changed, the Plan will need to be further modified to take into account the change in the prime rate. Because the prime rate as of April 20, 2017 was 4.0%, this is the rate that the Court will now use to apply the Prime Plus Approach required by *Till*.

    2.  Adjusting the Prime Rate for Risk

To evaluate risk factors, a hearing must be held to allow parties to "present evidence about the appropriate risk adjustment." *Till*, 541 U.S. at 479. Ultimately, the risk rate chosen must be "high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id.* at 480. Indeed, *Till* suggests that the Court should award a risk adjustment between 1.0% and 3.0%. *Id.* Further, the Fifth Circuit has stated that "a 1.00% adjustment represent[s] the low risk debtor and a 3.00% adjustment represent[s] a high risk debtor." *Texas Grand Prairie Hotel*, 710 F.3d at 334 n.54 (internal citations and quotations omitted). When considering the adjustment of the prime rate, courts should consider "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479. Further, the Supreme Court has held that the risk adjustment cannot be based on the creditor's "prior interactions with the debtor." *Id.*

*In re Bivens*, 317 B.R. 755 (Bankr. N.D. Ill. 2004), illustrates the appropriate analysis required by *Till* for a Chapter 13 plan. In *Bivens*, when the court examined the "risk factors," it took into account the following factors: (1) the debtor's two dependent children; (2) the debtor's job that she had maintained for four years; (3) the debtor's income and take-home pay; (4) extra income, such as child support; (5) the debtor's voluntary wage order; and (6) the debtor's good faith assertions to pay her creditors. *Id.* at 765. Further, the court gave credence to the fact that the debtor had "to find refuge under the Code" and concluded that the risk of default was somewhat reduced because the estate was being supervised by the Chapter 13 trustee and the debtor could not obtain new loans without express court approval. *Id.* The court also stated that the "post-petition payments are more indicative of whether or not Chapter 13 debtors will likely perform as they have proposed under their plans." *Id.* at 766. Ultimately, the court in *Bivens* assigned a 2.25% risk factor interest premium where the debtor was on an admittedly "very tight budget," earning only $1,989.67 per month, and separated from her husband, but where she had a steady job and had successfully stayed within her budget, thus demonstrating that there was a reasonable likelihood that she would be able to make the payments proposed under the plan— i.e., that the plan was feasible. *Id.* at 765–66, 768–69.

Even more so than the debtor in *Bivens*, this Court finds that the Debtors here have successfully proven that they have a low risk of default. First, Ms. Turcotte has been a teacher for two years with Cy-Fair ISD, and earns almost $70,000.00 per year. [Finding of Fact No. 1]; thus, she has a steady job. Moreover, if Cy-Fair ISD eliminates her present position, it is required to find her another position at another school within the district. [*Id.*]. Under these circumstances, the Court finds that Ms. Turcotte has significant job security and that the risk of losing her job is very low. Second, the Debtors have an amended wage order in place, [Findings

16

of Fact Nos. 7 & 8], and this order minimizes the risk of default because Cy-Fair ISD automatically withdraws the plan payment and remits the funds to the Chapter 13 trustee; therefore, there is no risk whatsoever of the Debtors' remitting an NSF check to the trustee or being overdrawn under an ACH payment. Indeed, the Debtors are current with their payments to the Chapter 13 Trustee. [Finding of Fact No. 9]. Third, the Debtors have surrendered one of their vehicles (i.e., the 2015 Mitsubishi Outlander), thereby reducing their monthly expenses, [Findings of Fact Nos. 3 & 9], which, in turn, reduces the risk that they will default in their payments to the Chapter 13 trustee. Fourth, the equity in the Sienna is $7,300.00, and the equity in the Tacoma is $6,800.00, [Finding of Fact No. 4]; therefore, the Credit Union is comfortably oversecured on each of the Claims, thus reducing its risk. Moreover, a review of the security agreement for each of these car loans reflects that the two loans are cross-collateralized. [Claim Nos. 6-2 & 7-2].[12] Thus, the aggregate equity of $14,100.00 secures both of the Claims, which further reduces the Credit Union's risk.

Vigorously disputing the Debtors, the Credit Union contends that the risk is not *de minimis* and that the rate adjustment should be 2.0%. [Finding of Fact No. 6]. The Credit Union believes that this risk adjustment is warranted "by the mere filing of the bankruptcy case." [Doc. No. 33, p. 2 of 2]. Further, at the hearing, the Credit Union argued that Mr. Turcotte's unemployment poses an additional risk. [Tape Recording, Apr. 20, 2017 Hearing, at 4:59:39–4:59:48 P.M.].

The Court finds the Credit Union's arguments to be unpersuasive. While the Court agrees that a risk adjustment is warranted, a 2.0% adjustment is not merited merely because the

---

[12] The exact language in the paragraph conveying the security interest reads, in pertinent part, as follows: "You are giving this interest to secure repayment of your loan as well as any amounts you now owe or will owe the Credit Union, except any loans secured by your principal residence." [Claim Nos. 6-2 (security interest, p. 2) & 7-2 (security interest, p. 2)].

Debtors filed bankruptcy or because Mr. Turcotte is unemployed. In *Bivens*, the court determined that the risk factor was 2.25%,[13] but the facts here are more favorable than the circumstances in *Bivens*. First, the facts that favored the debtor in *Bivens* are also present here: Ms. Turcotte has a steady job—generating enough income to pay the entire plan payment, [Finding of Fact No. 1]; the Debtors have a voluntary wage order that has already been implemented, [Findings of Fact Nos. 7 & 8]; and the Debtors are current with the Chapter 13 trustee and their plan payments, [Finding of Fact No. 9]. Second, unlike the debtor in *Bivens*, the Debtors do not have any minor children and they have been proactive about reducing their monthly expenses by surrendering one of their vehicles. [Findings of Fact Nos. 3 & 9]. Further, the probability of the Plan's success is high because of the amended wage order and Ms. Turcotte's job security. [Findings of Fact Nos. 1 & 7–9] Moreover, there is substantial equity (i.e., $14,100.00) in the collateral securing the Claims. [Finding of Fact No. 4]. Under all of these circumstances, the Court finds that the Debtors pose a relatively low risk and that a 1.0% risk adjustment is appropriate. *See In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d at 334 n.54 ("[A] 1.00% adjustment represent[s] the low risk debtor . . . .") (internal citations and quotations omitted).[14]

---

[13] In *Bivens*, the debtor's plan proposed a cramdown rate of 7.0%, which represented the sum of the then existing prime rate of 4.75% plus a risk factor interest premium of 2.25%. *Bivens*, 317 B.R. at 764. Thus, to be completely accurate, it was the debtor who proposed the 2.25% risk premium, as opposed to the court actually generating this figure. However, the court evaluated all of the circumstances, as required by *Till*, and then found that the proposed 2.25% interest premium was acceptable.

[14] The parameters suggested by the Supreme Court in *Till* concerning the adjustment for risk range from 1.0% to 3.0%. Further, several years after the Supreme Court issued its decision in *Till*, the Fifth Circuit stated that "[t]he general consensus that has emerged provides that a one to three percent adjustment to the prime rate *as of the effective date* [of the plan] is appropriate." *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d at 333 n.53 (citing and quoting *In re Riverbend Leasing LLC*, 458 B.R. at 535). A plausible argument can be made that neither *Till* nor *Grand Prairie* requires a bankruptcy court to stay within this two hundred basis points range, and thus the right evidentiary record might lead a court to find that the risk adjustment should be less than 1.0% or greater than 3.0%. Given the evidentiary record in the case at bar, this Court chooses to remain within the two hundred basis point range suggested by *Till* and, specifically, to adjust the rate by the least amount (i.e., one hundred basis points)

In sum, the current prime rate is 4.00% and the risk adjustment is 1.0%. Therefore, under the Prime Plus Approach, the appropriate cramdown rate for this case is 5.00%, as of the effective date of the Plan.

### 3. The Rate in Effect From the Petition Date to the Effective Date of the Plan is **Not** the Same Rate as the Rate Calculated Under *Till* to Take Effect on the Effective Date

There is no question that the Credit Union is oversecured. [Findings of Fact Nos. 3 & 4]. Section 506(b) provides that an oversecured creditor is entitled to interest on its claims. However, § 506(b) does not expressly address the issue of what rate of interest should be applied. In *In re Laymon*, the Fifth Circuit held that "when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest." 958 F.2d 72, 75 (5th Cir. 1992). Further, in *Matter of Southland Corp.*, the Fifth Circuit held that between the petition date and the effective date of the plan, the interest rate on the oversecured claim was the default rate provided for under the contract, unless this rate "would produce an inequitable . . . result." 160 F.3d 1054, 1060 (5th Cir. 1998). If there would be an inequitable result, then the rate would presumably be the non-default rate under the contract. *In re Shree Mahalaxmi, Inc.*, 522 B.R. 899, 916 (Bankr. W.D. Tex. 2014) ("[T]he Court holds that the Trust is not entitled to receive post-petition default interest, as no default in payment occurred prior to the Debtor filing bankruptcy."); *see also In re Cummins Util., L.P.*, 279 B.R. 195, 203–05 (Bankr. N.D. Tex. 2002); *In re Trinity Meadows Raceway, Inc.*, 252 B.R. 660, 669 (Bankr. N.D. Tex. 2000); *In re Delaney Family L.P.*, No. 02-46631-DML-11, 2003 WL 23957146, at *4–5 (Bankr. N.D. Tex. May 28, 2004).

Thus, in the case at bar, the interest rate on the Claims from the Petition Date (December 2, 2016) to the effective date of the Plan (which presumably will be July 27, 2017) will be the

---

suggested by *Till*. If Mr. Turcotte was employed and if the collateral was not a rapidly depreciating asset, this Court might be persuaded that the risk premium should be less than 1.0%.

non-default rate under the promissory notes executed by the Debtors for the benefit of the Credit Union. This is so because the Debtors were current as of the Petition Date, [Finding of Fact No. 9], so there can be no legitimate reason to use the default rate. Thus, under the Plan, the interest rate from the Petition Date to the effective date of the Plan will be 1.99% per annum (i.e., the non-default rate under the vehicle notes held by the Credit Union)—not the 5.0% cramdown rate that will apply after the effective date. This Court's ruling accords with the ruling issued by Judge Isgur in *Montemayor*, 2010 WL 5315814, at *1, except there, the contract rate exceeded the prime plus rate, whereas here, the contract rate is less than the *Till* rate.[15]  *See also SJT Ventures, LLC*, 441 B.R. 248, 252 (Bankr. N.D. Tex. 2010) ("In fact, the allowance of contract interest rates to apply to so-called 'pendency interest,' which is interest that accrues after filing of petition but prior to reorganization plan's effective date, is settled law in the Fifth Circuit.") (citing *Matter of Southland Corp.*, 160 F.3d at 1059–60).

## IV.  CONCLUSION

Because of *Till*, the cramdown interest rate on secured claims in Chapter 13 cases must be determined in a two-step approach. First, the starting point is to choose the national prime rate as of the effective date of the plan. Second, the rate must be adjusted upwards to account for the risk of default by the debtor. When a debtor successfully proves that he or she is a low risk, a low interest premium is warranted; conversely, when the affected creditor introduces evidence that the debtor poses a substantial risk, then a higher interest premium is merited. While the filing of bankruptcy might decrease an individual's creditworthiness, the decision to file bankruptcy is not the determinative factor for assessing how many basis points to add to the

---

[15] In *Montemayor*, the contract rate was 9.24%; whereas under the Prime Plus Approach, the rate was determined to be 5.25%. Therefore, Judge Isgur ruled that from the petition date up until the date that the plan was confirmed, the contract rate of 9.25% applied, and that once the plan was confirmed, the cramdown rate of 5.25% would apply. 2010 WL 5315814, at *1.

prime rate to adjust for the debtor's risk of default. Instead, the Supreme Court has held that courts must evaluate the totality of existing circumstances when adjusting the prime rate upwards for risk. *Till*, 541 U.S. at 479–80.

Here, the Debtors have shown why they are a relatively low risk, but *Till* bars them from obtaining confirmation of the Plan: its proposed cramdown rate of 1.99% violates the Prime Plus Approach, and therefore they cannot satisfy § 1325(a)(5)(B)(ii). Rather, the Debtors must pay the Claims at a rate of prime plus one percent, which presently equates to 5.0% per annum. Therefore, this Court will enter an order denying confirmation of the Plan without prejudice to the Debtors filing an amended plan that proposes to pay the Claims at a rate of 5.0% per annum as of the effective date of the amended plan, with a rate of 1.99% per annum being the rate in effect from the Petition Date up to the effective date of the amended plan.

A separate order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed on this 8th day of June, 2017.

Jeff Bohm
United States Bankruptcy Judge